Judith A. Zahid (SBN 215418)
Heather T. Rankie (SBN 268002)
James S. Dugan (SBN 325565)
ZELLE LLP
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone: (415) 693-0700
jzahid@zelle.com
hrankie@zelle.com
jdugan@zelle.com

*Attorneys for Plaintiffs* Franciscan Alliance, Inc. and King County Public Hospital District No. 1 (DBA Valley Medical Center)

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCISCAN ALLIANCE, INC. and KING COUNTY PUBLIC HOSPITAL DISTRICT NO. 1 (DBA VALLEY MEDICAL CENTER), | Case No. ___5:21-cv-05198___ |
| Plaintiffs, | **COMPLAINT** |
| vs. | **CLASS ACTION** |
| INTUITIVE SURGICAL, INC., | DEMAND FOR JURY TRIAL |
| Defendant. | |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................I

INTRODUCTION .......................................................................................................... 1

PARTIES ........................................................................................................................ 4

JURISDICTION ............................................................................................................. 6

VENUE ........................................................................................................................... 6

GENERAL ALLEGATIONS ......................................................................................... 7
    I.      Intuitive's da Vinci Surgical Robot and EndoWrists.................................... 7
    II.    Intuitive's Market Power in the Minimally Invasive Surgical Robot
         Market ....................................................................................................... 10
         A.     The Market for Minimally Invasive Surgical Robots ............................ 10
         B.     Lack of Competition in the Market for Minimally Invasive
              Surgical Robots .................................................................................... 14
    III.   Intuitive's Monopolization of the Aftermarket for da Vinci Robot Parts
         and Service ............................................................................................... 15
         A.     The Aftermarket for da Vinci Robot Parts and Service .......................... 16
         B.     Intuitive's Anticompetitive and Exclusionary Conduct in the
              Aftermarket for da Vinci Robot Parts and Service ................................. 18
    IV.   Intuitive's Monopolization of the Aftermarket for Replacements and
         Repairs of EndoWrists ............................................................................. 22
         A.     The Aftermarket for Replacements and Repairs of EndoWrists ............. 22
         B.     Intuitive's Anticompetitive and Exclusionary Conduct in the
              Aftermarket for Replacements and Repairs of EndoWrists..................... 27

EFFECTS OF INTUITIVE'S ANTICOMPETITIVE AND EXCLUSIONARY
    BEHAVIOR............................................................................................................ 41
    I.      General Effects on Competition................................................................ 41
    II.    Effects on Hospitals and Other Purchasers of da Vinci Surgical Robots ............ 43

STATUTE OF LIMITATIONS ..................................................................................... 44

CLASS ACTION ALLEGATIONS .............................................................................. 45

CAUSES OF ACTION .................................................................................................. 48

PRAYER FOR RELIEF ................................................................................................ 52

JURY TRIAL DEMAND .............................................................................................. 53

**INTRODUCTION**

1.      Defendant Intuitive Surgical, Inc. ("Intuitive") dominates the market for minimally invasive surgical robots with its da Vinci surgical robots. Intuitive's dominance in this market is so complete that for over a decade Intuitive faced *no competition whatsoever*, and even now Intuitive maintains a market share of at least 98%. Through exclusionary and anticompetitive conduct, Intuitive abuses this dominance to monopolize two separate markets: (1) the aftermarket for da Vinci robot parts and service; and (2) the aftermarket for replacements and repairs of EndoWrists, the costly, limited-use surgical instruments (such as graspers, forceps, and scissors) required to perform surgery with a da Vinci robot.

2.      The da Vinci surgical robot requires regular maintenance and upkeep. Medical repair companies are capable of providing those services to Intuitive's customers—and have, in fact, provided such services. These services return the da Vinci to full capability and do not compromise safety. Moreover, Intuitive's customers often pay substantially less—sometimes as little as half—for third-party repairs than Intuitive charges for the same services.

3.      Despite Intuitive's supracompetitive pricing, Intuitive maintains a near-stranglehold on this aftermarket by unlawfully leveraging its dominance in the primary market for minimally invasive surgical robots to exclude competitors from and minimize competition in the aftermarket for parts and service for those robots. Intuitive insulates itself from competition in this aftermarket through tactics such as the following:

- When customers purchase a da Vinci surgical robot—again, effectively the only option in the market for minimally invasive surgical robots—Intuitive requires that they enter into multi-year, exclusive servicing agreements.

- Those service agreements prohibit the use of third-party servicers to perform any repairs or maintenance on the da Vinci or its component parts. Under those agreements, violation of this prohibition voids the warranty on the da Vinci robot itself.

- Intuitive has designed the da Vinci such that, in at least some instances, the robot requires an Intuitive product serial number for the replacement part in order to restart the robot. Intuitive does not provide serial numbers to any third parties. Accordingly, Intuitive ensures that it remains the only manufacturer of replacement parts for the da Vinci robot.

1

- Intuitive forces customers to purchase da Vinci robot service from Intuitive in order to get access to da Vinci parts. Intuitive sells da Vinci robot parts only directly to customers as part of the robot service. Because Intuitive is the only manufacturer of da Vinci robot parts, customers must contract with Intuitive for servicing in order to have access to those parts.

- Intuitive encrypts and hides from da Vinci robot owners and third-party service providers the software necessary to perform some kinds of maintenance on the da Vinci.

- Intuitive aggressively enforces these contractual and technological ties. Customers who use third-party servicers to perform maintenance or repairs on the da Vinci robot have received cease-and-desist letters from Intuitive. In those letters, Intuitive has threatened to refuse any future servicing or maintenance on any robot serviced by a third party, and even threatened to disable the surgical robot in question. In one instance, a surgical robot that Intuitive had the capability to monitor in real time, belonging to a customer that had tried to use a third-party repair service, ceased functioning **during an operation**, forcing the surgeons to complete the surgery manually.

4.     These tactics have enabled Intuitive to charge supracompetitive prices and maintain outsized margins in the aftermarket for da Vinci robot parts and service. In 2020, Intuitive reported $723.8 million in revenue and $456.9 million in gross profit for robot services, good for an operating margin of 63.1%. In 2019, pre-pandemic, Intuitive's servicing segment was even more profitable: Intuitive generated $724.2 million in revenue and $475 million in gross profit at an operating margin of 65.6%. As for replacement parts, Intuitive reported a gross margin of 66% in 2020 and a pre-pandemic margin of 70% in 2019 for all product sales. Those figures, however, account for the sale of both the da Vinci robot itself as well as replacement parts; on information and belief, Intuitive has gross margins in excess of 90% for da Vinci robot replacement parts.

5.     Intuitive has used similar tactics to unlawfully monopolize the aftermarket for repairs and replacements of EndoWrists. EndoWrists are in many ways similar to traditional laparoscopic surgical instruments but are used exclusively with the da Vinci surgical robot. Although the surgical ends of EndoWrists are essentially identical to the instruments that doctors have used in traditional minimally invasive surgeries for decades, Intuitive designed its da Vinci robots and the software that runs them so that EndoWrists are the only surgical instruments compatible with those robots. Repairs of traditional laparoscopic surgical instruments have been performed routinely for decades and are standard practice in the health services industry. And,

indeed, various third parties offer, or have attempted to offer, repairs of EndoWrists as a service. Such services are attractive to hospitals and other purchasers (such as surgery centers) of da Vinci robots, who are eager to reduce costs and who have complained about the excessive cost of replacement EndoWrists from Intuitive.

6.     Intuitive, however, has engaged in anticompetitive conduct not only to prevent any repairs of EndoWrists but also to render them inoperable after a set number of uses, regardless of their condition. Instead of being free to continue using perfect EndoWrists or to repair or service EndoWrists that need it, hospitals with da Vinci surgical robots are forced to constantly buy new, unnecessary replacement EndoWrists from Intuitive. The ways in which Intuitive has forced hospitals into this bind include the following:

- Intuitive designed its da Vinci robot software to reject any surgical instrument that does not have an Intuitive-generated serial number. Intuitive does not provide such serial numbers to any other company, effectively eliminating the possibility of third-party-manufactured EndoWrist replacements.

- Intuitive sets arbitrary use limits for each EndoWrist, and its standard sales and service agreements for its da Vinci surgical robots *expressly require that the customer adhere to the "maximum number of uses" requirement for EndoWrists*. The most common use limit Intuitive sets is ten, even for EndoWrists that safely can be used for several times that limit. In some cases, EndoWrists otherwise could be used for well over 100 procedures—as evidenced by the fact that EndoWrists reserved for training purposes are indeed used that many times.

- Intuitive enforces its EndoWrist use limits by programming the chips in its EndoWrists to render the EndoWrist non-functional after the set number of uses, even if the EndoWrist remains in perfect condition.

- Intuitive's standard sales and service agreements for its da Vinci surgical robots *expressly prohibit its customers from performing repairs* on their EndoWrists.

- Intuitive routinely intimidates customers who circumvent the EndoWrist chips' memory-wiping feature or otherwise elect to repair their EndoWrists (*e.g.*, through third-party repair services) with threats to render not just the customers' specific EndoWrists but their entire robots inoperable unless they cease their attempts to avoid constantly buying new, unnecessary replacement EndoWrists from Intuitive. For example, Intuitive has threatened to "paperweight" a hospital's robot, *i.e.*, withhold services and thus make the robot useless for any function other than serving as a large, expensive paperweight.

7.     This anticompetitive scheme has been extremely profitable for Intuitive, allowing it to sell thousands of replacement EndoWrists at eye-popping margins. Intuitive's overall net margin is over 30% based on $1.38 billion in net income on $4.48 billion of total revenue. These

margins are significantly higher than margins for typical medical device companies, surgical robotic companies, or other companies that make complex medical equipment. And, tellingly, Intuitive earns far more revenue ($2.41 billion in 2019; $2.46 billion in 2020) from sales of its simple EndoWrist instruments than it does from sales of the complex, multi-million-dollar da Vinci robots ($1.34 billion in 2019; $1.18 billion in 2020).

8.     But Intuitive's scheme has come at the direct expense of hospitals and other purchasers of da Vinci robots. Because of these anticompetitive restrictions, purchasers of da Vinci robots are unable to repair their EndoWrists or use them beyond the artificially low number of uses Intuitive allows. Instead, they have been forced to purchase far more of the costly replacement EndoWrists from Intuitive than they otherwise would have to purchase, driving up the cost of minimally invasive robotic surgery. They also have been forced to overpay for each replacement EndoWrist, as Intuitive's scheme has allowed it to charge supracompetitive prices for replacement EndoWrists. Finally, Intuitive's scheme has freed it from any competitive pressure to make the investments necessary to improve the quality of replacement EndoWrists.

9.     Intuitive's monopolization of both the aftermarket for da Vinci robot parts and service and the aftermarket for replacements and repairs of EndoWrists is exactly the type of abuse of economic power that the antitrust laws seek to prevent. Plaintiffs accordingly bring this action under those laws, on behalf of themselves and a Class of similarly situated customers, to end and seek redress for Intuitive's illegal conduct.

## PARTIES

10.     Plaintiff Franciscan Alliance, Inc. operates a not-for-profit healthcare system, known as Franciscan Health, Inc. (collectively, "Franciscan"). Franciscan is one of the largest Catholic healthcare systems in the Midwest, with 13 hospital campuses that serve patients in Indiana, Illinois, and Michigan.

11.     Franciscan has offered minimally invasive robotic surgery to its patients for over a decade, and multiple Franciscan campuses have da Vinci surgical robots. Once such campus, Franciscan Health Crown Point, in Crown Point, Indiana, first purchased a da Vinci surgical robot in 2010. Franciscan Health Michigan City, in Michigan City, Indiana, has owned and operated a

da Vinci surgical robot since 2010. And Franciscan Health Dyer, in Dyer, Indiana, has owned and operated a da Vinci surgical robot since 2012.

12.     At these and other Franciscan campuses, surgeons regularly use da Vinci robots to perform minimally invasive robotic surgeries. Surgeons at Franciscan Health Indianapolis, for example, performed 455 da Vinci procedures in 2017 alone. Franciscan surgeons use the da Vinci surgical robot for a variety of surgeries, including general, gynecologic, colorectal, thoracic, and urologic procedures.

13.     The service and sales agreements associated with Franciscan's purchase of these da Vinci robots required that Franciscan use Intuitive as its exclusive servicer for any maintenance of its da Vinci robots, and that Franciscan purchase replacement EndoWrists according to Intuitive's arbitrary use limits. As a result, for each of its da Vinci robots, Franciscan has been required to regularly purchase maintenance services at supracompetitive prices and to frequently purchase unnecessary replacement EndoWrists from Intuitive. Franciscan spent substantially more on da Vinci robot parts and service and on replacement EndoWrists than it would have absent Intuitive's anticompetitive conduct.

14.     Plaintiff King County Public Hospital District No. 1, DBA Valley Medical Center ("Valley Medical"), is a Washington municipal corporation and nonprofit healthcare provider located in Renton, Washington. Valley Medical is the largest nonprofit healthcare provider between Seattle and Tacoma, serving over 600,000 residents. Valley Medical is managed as a component of University of Washington Medicine, subject to the oversight of a Board of Trustees, and includes a hospital and a network of more than 40 primary and specialty care clinics throughout Southeast King County, Washington.

15.     Valley Medical has used da Vinci surgical robots, including the Si and Xi, since 2006 at the latest. Today Valley Medical owns two Xi surgical robots, which Valley Medical uses for surgeries and conditions including hysterectomy, fibroid tumor, gynecologic cancer, and other gynecologic surgery. Over the last several years, Valley Medical has averaged nearly 350 surgeries annually using da Vinci surgical robots. That number has increased in recent years, reaching 430 such surgeries in 2019 alone.

1     16.    The service and sales agreements associated with Valley Medical's purchase of these da Vinci robots required that Valley Medical use Intuitive as its exclusive servicer for any maintenance of its da Vinci robots, and that Valley Medical purchase replacement EndoWrists according to Intuitive's arbitrary use limits. As a result, for each of its da Vinci robots, Valley Medical has been required to regularly purchase maintenance services at supracompetitive prices and to frequently purchase unnecessary replacement EndoWrists from Intuitive. Valley Medical spent substantially more on da Vinci parts and service and on replacement EndoWrists than it would have absent Intuitive's anticompetitive conduct. In total, Valley Medical paid Intuitive $3,427,795 in 2019 alone.

17.    Defendant Intuitive Surgical, Inc. is a Delaware corporation with its principal place of business at 1020 Kifer Road, Sunnyvale, California. Intuitive is the creator of the da Vinci line of minimally invasive surgical robot devices and the EndoWrist line of surgical instruments. Intuitive sells da Vinci surgical robots and EndoWrist surgical instruments, as well as related parts and service, to hospitals and surgical centers throughout the United States and the world.

## JURISDICTION

18.    This action is brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; and Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15 and 22. Defendant has been engaged in interstate commerce during all relevant times of the Complaint.

19.    This Court has personal jurisdiction over Defendant due to its business activities in this district.

## VENUE

20.    Venue is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c).  Intuitive transacts business in this district and a substantial part of the events giving rise to all claims occurred in this district.

1

**GENERAL ALLEGATIONS**

2

I.      **Intuitive's da Vinci Surgical Robot and EndoWrists**

3

21.      Intuitive's da Vinci robot system is used for minimally invasive soft tissue surgery

4

for areas of the body between the pelvis and the head—primarily in general surgery, cardiac

5

surgery, colorectal surgery, gynecologic surgery, head and neck surgery, thoracic surgery, and

6

urologic surgery. Aspects of da Vinci robotic surgeries mirror traditional minimally invasive

7

surgeries that have been performed for decades. Doctors make small incisions in soft tissue and

8

insert surgical instruments—for example, graspers, scissors, scalpels, and needle drivers at the end

9

of long narrow tubes—to manipulate, cut, and sew tissue.

10

22.      In non-robotic surgeries, doctors manipulate the instruments directly with their

11

hands. In da Vinci surgeries, doctors attach the instruments to the mechanical arms of the

12

surgical robot. Intuitive sells more than 80 different types of these surgical instruments, including

13

a variety of graspers, scissors, scalpels, and needle drivers. These instruments used in da Vinci

14

surgeries (called EndoWrists) are constructed from traditional medical grade materials, such as

15

stainless steel, composites, and tungsten cables. The image below shows various EndoWrists:

16

17

18



19

20

21

22

23

24

23.      The surgical ends of EndoWrists are essentially identical to the instruments that

25

doctors have used in traditional minimally invasive surgeries for decades. The image on the left is

26

an EndoWrist and the image on the right is a traditional, manually manipulated instrument:

27

28

7

1
2
3
4
5
6
7
8
9
10
11

 

12    24.    Many of the EndoWrist instruments have a wide degree of motion at the working

13  tip of the instrument, capable of rotation in multiple planes, and providing an extra level of

14  dexterity that is not available in traditional surgical instruments. The movement at the instrument

15  tip is controlled by tungsten cables located within the EndoWrist. (Tungsten cables are common

16  in surgical robots, and surgical cables are among the parts that independent surgical repair

17  providers commonly repair.) These tungsten cables are actuated by internal pulleys of the

18  EndoWrist that mechanically interface with motors within the robot arms of the da Vinci system.

19  The motors within the robot arms in turn cause the movement of the instrument tip commanded

20  by the surgeon by changing the position of the pulleys and tungsten cables. For the vast majority

21  of EndoWrists, these mechanical components provide for all controls of the EndoWrist's

22  instrument tip.

23
24
25
26
27
28

CLASS ACTION COMPLAINT

25.     The image below shows how, instead of being manipulated directly by the doctors' hands, the EndoWrists are attached to mechanical arms of the surgical robot:



26.     Doctors direct the surgery by manipulating controllers on the robot console, which allow for precision control of the robot arms and EndoWrist instruments. This allows the surgeon to specify movements on a scale that is at least an order of magnitude less than the surgeon's actual hand movements at the console. The image below shows a doctor manipulating the instruments:



CLASS ACTION COMPLAINT

27.     EndoWrists also include an internal memory chip. The internal chip does not control the movement of the EndoWrist instrument tip, but instead stores certain information about the particular EndoWrist, including a model number specific to the type of EndoWrist, a part ID specific to the particular EndoWrist, a chip ID for the chip itself, and a counter value for the particular EndoWrist.

28.     The counter counts the number of times the EndoWrist is attached to a da Vinci robot arm, not an actual measure of usage such as usage time, number of movements, or actuation time.  The chip also does not monitor the components of the EndoWrist for conditions that could be indicative of actual or impending failure, such as the lack of response of the instrument tip to requested movement or a motor requiring excessive force to cause a desired movement of the tungsten cables.

29.     The da Vinci robot queries the memory chip prior to performing any operations with the particular EndoWrist. After a certain number of uses—usually ten—the chip wipes itself and, because the robot cannot identify the EndoWrist after the memory-wipe, the EndoWrist is rendered non-operational, based solely on the number of times it is attached to a da Vinci robot arm, without any regard to the actual underlying physical condition of the EndoWrist.

**II.     Intuitive's Market Power in the Minimally Invasive Surgical Robot Market**

30.     Intuitive has monopoly power in the domestic market for minimally invasive surgical robots. The Intuitive surgical robot, called the da Vinci surgical system, is ubiquitous in eminent hospitals throughout the United States.

**A.     The Market for Minimally Invasive Surgical Robots**

31.     Intuitive has at least a 98% market share in the market for minimally invasive surgical robots. As detailed below, any competition in that market is *de minimis*. Minimally invasive robotic surgeries and da Vinci surgeries are largely considered one and the same.

32.     At the end of 2020, Intuitive had an installed base of 5,989 da Vinci surgical robots worldwide (up from 5,582 in 2019), including 3,720 in the U.S. (covering all 50 states), 1,059 in Europe, 894 in Asia, and 316 in the rest of the world. In 2020 alone, da Vinci robots were used in over 1,243,000 surgeries worldwide (up from 1,229,000 in 2019), and Intuitive reported $1.18

billion in revenue for sales and leases of surgical systems, almost all of which came from its da Vinci robot systems. Prior to the COVID-19 pandemic, in 2019, Intuitive reported $1.346 billion in revenue for sales and leases of surgical systems, almost all of which came from its da Vinci robot systems.

33.     There are significant barriers to entry into the minimally invasive surgical robot market.

34.     *First*, Intuitive has a large portfolio of patents that have enabled it to block potential competitors from entering the marketplace. Indeed, Intuitive has stated in a court pleading that as of December 31, 2018, it held ownership or exclusive field-of-use licenses for more than 3,000 U.S. and foreign patents. Intuitive is notorious for aggressively amassing and enforcing these patents.

35.     *Second*, developing a competing minimally invasive surgical robot is an expensive, lengthy, and uncertain process. The research and development required to bring a surgical robot to market is substantial. And clearance by the U.S. Food & Drug Administration ("FDA"), which has a rigorous process for clearing any surgical robot for sale, is uncertain.

36.     *Third*, even if a competing product were developed, Intuitive's installed base of da Vinci robots would significantly slow even a superior product's acquisition of market share. Intuitive has a substantial installed base of nearly 6,000 da Vinci robots worldwide. Switching to a different surgical robot would be costly and risky for hospitals. Surgical robot systems have an average sales price of more than $1.5 million, making them a large investment for customers. Intuitive also has used a website to steer patients toward surgeons who perform more than a certain number of da Vinci robot surgeries, meaning potential patients will seek out doctors and hospitals who use da Vinci robots, further increasing the financial risks associated with abandoning the da Vinci for a competitor.

37.     *Fourth*, hospitals and other surgical centers interested in switching to another surgical robot would need to re-train both their staff and their doctors, who would need to abandon the da Vinci surgical methods they have been performing for years (for some, their entire careers) and learn how to perform surgeries with different surgical robots. This process would be both

costly and likely to generate substantial resistance, particularly given that Intuitive invests heavily to ensure that doctors and medical students are trained to use, and dependent on, the da Vinci system. Intuitive has aggressively marketed da Vinci robots and has paid surgeons substantial sums—in some cases, millions of dollars—to promote da Vinci robots by, *e.g.*, giving talks about da Vinci robots, teaching others how to use them, and testing and writing reviews of them. Some surgeons would switch hospitals rather than switch surgical systems, further driving up costs for any hospital that sought to replace da Vinci robots with competing robots.

38.     The market for minimally invasive surgical robots is a distinct market. For example, although traditional laparoscopic surgeries are far cheaper than robotic alternatives and their outcomes have been reported to be largely equivalent, Intuitive has successfully promoted robotic surgery as a superior alternative to traditional laparoscopic surgery. With patients and doctors demanding robotic options, hospitals are compelled either to offer them or to forego significant business. Intuitive claims that robotic surgeries provide several advantages for surgeons over traditional laparoscopic surgeries, including increased dexterity, improved hand-eye coordination and ergonomic position, and improved visualization.  The robot has more "arms" than a human, which allows the surgeon to hold additional instruments. The "wrists" of the robot have a greater range of motion than a human wrist, which allows for greater dexterity. The movements of the instruments can be scaled relative to the movements of the controller, which allows for greater precision. The console from which the surgeon operates is designed to minimize surgeon fatigue.

39.     Because of the distinct attributes of surgical robots and Intuitive's aggressive promotion of the da Vinci, many doctors and patients believe robotic surgeries are superior to traditional laparoscopic surgeries. Intuitive advertises that da Vinci surgeries provide patients with "improved outcomes" and "fewer complications" and that a hospital that lacks a da Vinci robot will provide patients with worse outcomes and more complications.

40.     Many doctors prefer to perform—and indeed only have the skills to perform— robotic surgeries and not traditional laparoscopic surgeries.  They learned how to perform robotic surgeries (in particular, da Vinci surgeries) in medical school, and they have been performing only

CLASS ACTION COMPLAINT

da Vinci surgeries for years.  These doctors will work only at hospitals that have da Vinci surgical robots.

41.     Intuitive and many hospitals promote the distinction between robotic da Vinci surgeries and traditional surgeries. They emphasize the alleged superiority of robotic da Vinci surgeries. Intuitive states that "100% of the top-ranked U.S. hospitals for cancer, urology, gynecology and gastroenterology diseases all use da Vinci surgical systems."

42.     Because of the perceived superiority of robotic surgeries over traditional laparoscopic surgeries, patients elect for robotic surgeries instead of traditional laparoscopic surgeries regardless of cost differential. Robotic surgeries generally cost from $2,500 to $6,000 more than traditional laparoscopic surgery. Despite the much higher cost of robotic surgery, the number of robotic procedures has increased almost tenfold over the past dozen years: from 136,000 in 2008 to an estimated 1,243,000 in 2020 according to Intuitive. Intuitive boasts that a surgeon starts a procedure using a da Vinci surgical robot every 25.4 seconds.

43.     There is very low, if any, cross-elasticity of demand between minimally invasive surgical robots and equipment for traditional laparoscopic surgery. They are two separate markets at two entirely independent price points. Costs for the surgical instruments used in most traditional laparoscopic surgeries are on average less than $1,000 per instrument for the entire lifetime of the instrument, which often includes hundreds of uses. In contrast, a surgical robot like the da Vinci costs approximately $1.5 million or $2.4 million, depending on the model. And according to one source, the average cost of equipment used in robotic surgery is $3,567 *per procedure*, which includes $1,855 for instruments and accessories and $1,701 dedicated to purchasing and maintaining the system. Despite the higher cost of surgical robots, hospitals continue to purchase da Vinci robots.

44.     Moreover, the industry and the public recognize minimally invasive surgical robots as a distinct economic category, and they specifically refer to the market for surgical robots and competition (or lack thereof) in surgical robots.

45.     There are several professional and trade associations focused on robotic surgery, including the Society of Robotic Surgery and the Clinical Robotic Surgery Association. Moreover,

1    most manufacturers that make surgical robots specialize in surgical robots. They do not also make

2    equipment for traditional, laparoscopic surgeries.

3        46.    The relevant geographic market for minimally invasive surgical robots is

4    nationwide. FDA approval is required for all surgical robots used in the United States, meaning

5    that U.S. hospitals cannot purchase minimally invasive surgical robots offered for sale outside of

6    the United States that have not received such FDA approval as substitutes for the da Vinci.

7        **B.  Lack of Competition in the Market for Minimally Invasive Surgical
           Robots**

8

9        47.    From 1999 to 2017, the da Vinci robot was the only minimally invasive surgical

10   robot cleared by the FDA for sale in the domestic market.  Intuitive installed more than 2,000 da

11   Vinci robot systems during its time as the only manufacturer in the minimally invasive surgical

12   robot market. From 2017 through today, Intuitive has maintained at least a 98% market share in

13   the worldwide and domestic minimally invasive surgical robot markets.

14       48.    Medical device company TransEnterix (now known as Asensus) received FDA

15   clearance for a minimally invasive surgical robot, the Senhance Surgical Robotic System, in

16   October 2017. The Senhance is, at best, a limited potential substitute for the da Vinci. The

17   Senhance Surgical System is intended for use only in gynecological surgery, colorectal surgery,

18   cholecystectomy, and inguinal hernia repair. It is not intended for cardiothoracic surgery, urologic

19   surgery, or most other procedures for which the da Vinci robot system is intended. The Senhance

20   Surgical System also is not indicated for pediatric use.

21       49.    TransEntrerix's presence in the market remains *de minimis*. In 2020, TransEnterix

22   installed ten Senhance surgical robots worldwide, three of which were installed domestically. In

23   contrast, in 2020, Intuitive installed 936 da Vinci surgical robots worldwide, including 600 in the

24   United States; in 2019, pre-COVID, Intuitive installed 1,119 da Vinci surgical robots worldwide,

25   including 728 in the United States.

26       50.    Other medical device companies have announced plans to enter the minimally

27   invasive robot market, but their products are in the development stage and they have no market

28

share. For example, Medtronic's Hugo system is in development, but Medtronic has not even sought FDA approval, much less received it.

51.     Other robotic surgical devices, which are not in the minimally invasive surgical robot market and do not compete with Intuitive's da Vinci surgical robot, have recently emerged. For example, Medtronic and Stryker make devices for use in orthopedic surgeries. Medtronic makes the Mazor X Stealth device for use specifically in spinal implant surgery, and Stryker makes the Mako products for use in aligning implants in knee and hip replacement surgeries. These orthopedic surgery robots are not substitutes for, and do not compete with, Intuitive's da Vinci robots, which are not used for orthopedic surgeries. The orthopedic surgery robots are not part of the minimally invasive surgical robot market.

52.     While Medrobotics received FDA clearance for its Flex robot for use in natural orifice surgeries, the Flex robot can be used only for surgeries that involve insertion of instruments through the body's natural orifices. The Flex instruments cannot be inserted through the small incisions through which instruments are inserted in da Vinci surgeries. Accordingly, the Flex robots are not substitutes for, and do not compete with, Intuitive's da Vinci robot. Moreover, Medrobotics' Flex robots have a *de minimis* presence in the marketplace, with even fewer sales than TransEnterix's Senhance robot. Intuitive, TransEnterix, and Medrobotics are the only three manufacturers of commercially available surgical robots in the United States.

53.     Intuitive's dominance in the market for surgical robots is so great that even if these surgical robots used for entirely different procedures, such as orthopedic surgery, are considered, recent estimates of Intuitive's overall share of even that larger collection of robots range from 77% to 80%.

### III.     Intuitive's Monopolization of the Aftermarket for da Vinci Robot Parts and Service

54.     Intuitive uses its dominance in the primary market for minimally invasive surgical robots to unlawfully monopolize the aftermarket for da Vinci robot parts and service. Since Intuitive had and has monopoly power in the market for minimally invasive surgical robots, there is no competition in that market that can constrain Intuitive from acting anticompetitively in the

aftermarket for da Vinci robot parts and service. Rather, its dominance in the primary market allows Intuitive to exploit purchasers of da Vinci robots when it comes to parts and service by requiring them to exclusively contract for Intuitive's own robot parts and service. Hospitals frustrated with the cost of maintaining their da Vinci robots through Intuitive cannot realistically turn elsewhere for da Vinci robot parts or service. Absent these practices, hospitals would benefit from competition in this aftermarket.

### A.  The Aftermarket for da Vinci Robot Parts and Service

55.     There is an aftermarket for da Vinci robot parts and service that is separate from the market for minimally invasive surgical robots.

56.     In order to operate and maintain a da Vinci surgical robot, a hospital must acquire and replace or maintain as necessary the cluster of da Vinci robot parts that are specially designed and built for the da Vinci robot system, including the robot arm assemblies, master tool manipulators (MTMs), printed circuit boards (PCBs), and other components (collectively "da Vinci robot parts"). Intuitive sells da Vinci robot parts to da Vinci robot customers around the world but Intuitive does not sell da Vinci robot parts to any entity that does not own or lease a da Vinci robot.

57.     Operating the da Vinci also inevitably requires servicing the surgical robot from time to time. Servicing da Vinci robots requires specialized training and experience. Besides Intuitive, no more than a handful of companies service da Vinci robots. Because both Intuitive and its few competitors in this aftermarket are based in the United States, the relevant geographic market for the aftermarket for da Vinci robot parts and service is nationwide—there are no foreign competitors to which U.S. customers can turn.

58.     Intuitive has monopoly power in the aftermarket for da Vinci robot parts and service, both domestically and worldwide. There are significant barriers to entry in this aftermarket, and Intuitive leverages its monopoly power in the market for minimally invasive surgical robots to create an additional and distinct monopoly in the aftermarket for the parts and service of da Vinci surgical robots. As a result of its monopoly in the primary market, Intuitive is

able to exclude competitors from the aftermarket for da Vinci robot parts and service and maintain prices in that aftermarket at supracompetitive levels.

59.     At this time, Intuitive is the only manufacturer of da Vinci robot parts. For calendar year 2020, Intuitive had an overall gross margin on product sales of more than 66%, a slight dip from the pre-pandemic gross margin on product sales of more than 70% that Intuitive enjoyed in calendar year 2019. Upon information and belief, Intuitive realizes gross margins in excess of 90% for da Vinci robot parts.

60.     Da Vinci robot parts are not available from other sources. This is due in part to patent protection and development costs, but also to the fact that, in at least some instances, the da Vinci robot system requires an Intuitive product serial number for the replacement part in order to restart the robot system. Intuitive also excludes competition in the sale of da Vinci robot parts by requiring customers to purchase a parts and service plan from Intuitive with the purchase of the robot.

61.     For service of da Vinci robots, in 2020 Intuitive reported $723.8 million in revenue and $456.9 million in gross profit for robot services. Intuitive had an operating margin of 63.1% on robot services. In 2019, Intuitive reported $724.2 million in revenue and $475.0 million in gross profit for robot services, with an operating margin of 65.6% on robot services.

62.     Intuitive encrypts and hides from robot owners and third-party service providers the service software necessary to perform maintenance on the da Vinci. The service software is necessary to test the robot arms during preventative maintenance, to input Intuitive serial numbers after replacing da Vinci robot parts, and to remove the reminder message after performing preventative maintenance or repairing the robot system.

63.     Intuitive also forces customers to enter into long-term service contracts of five years or more when they purchase a da Vinci surgical robot. The first year of service is included under the product warranty, and the remaining four years are billed at a stated service price typically in the range of $100,000 to $200,000 per year. More than 70% of the da Vinci surgical robots sold in the United States have been shipped in the last five years and thus remain locked into the initial Intuitive contract.

64.     Intuitive leases da Vinci robot systems to a small minority of customers. If the customer leases the system, Intuitive requires a service contract at the time of leasing, again typically in the range of $100,000 to $200,000 per year after the one-year warranty period, for the term of the lease, which is typically four to seven years.

65.     Intuitive secures long-term service contracts with existing customers rolling off their original service agreement.

66.     Intuitive also forces customers to purchase da Vinci robot service from Intuitive to get access to da Vinci robot parts. Intuitive sells da Vinci robot parts only directly to customers as part of the robot service.

67.     Intuitive reports that "substantially all" of the installed base has contracts for da Vinci robot service with Intuitive.

### B. Intuitive's Anticompetitive and Exclusionary Conduct in the Aftermarket for da Vinci Robot Parts and Service

68.     Thanks to Intuitive's anticompetitive conduct, there is practically no competition in the aftermarket for da Vinci robot parts and service. No more than a handful of companies compete with Intuitive in this aftermarket. One such company, Restore Robotics ("Restore"), began to offer parts and service for the da Vinci surgical robot in 2018. Restore typically offers service at effective rates of less than 50% of the effective rates offered by Intuitive.

69.     In response, Intuitive has taken multiple anticompetitive measures to thwart competition and maintain its monopoly in the aftermarket for parts and service of da Vinci robots. *First*, as described above, Intuitive uses contractual ties to lock its customers into servicing agreements with Intuitive, rather than any third-party servicers. *Second*, as also described above, Intuitive designed the da Vinci surgical robot to minimize the ability of a third-party to perform maintenance on or manufacture replacement parts for the robot. *Third*, as described below, Intuitive aggressively enforces these contractual and technological ties in order to prevent any third-party servicer from developing substantial market share in the aftermarket for da Vinci robot parts and service.

70.     For example, when Intuitive learned that a hospital system was using Restore for robot service, Intuitive informed the customer that its hospitals would not be able to purchase da Vinci robot parts for use in any service performed by Restore. On or about February 12, 2019, Intuitive also sent a letter to Restore demanding that Restore "immediately cease and desist" from "contacting Intuitive's customers to offer services related to Intuitive's products."

71.     Assertions of quality control are not valid business justifications for excluding third parties from servicing da Vinci robots. Intuitive contracts with third-party distributors of da Vinci robots outside the U.S. to service da Vinci robots. Moreover, Restore uses former Intuitive personnel, *i.e.*, da Vinci-certified field service engineers with prior training and experience at Intuitive in servicing da Vinci robot systems, to provide da Vinci robot service.

72.     Intuitive's exclusionary conduct in the market for da Vinci robot parts and service is further illustrated by its coercive response when Ardent Health Service ("Ardent") used Restore to service da Vinci robots. Ardent, owner of Hillcrest Medical Center and Hillcrest Hospital South ("Hillcrest") in Tulsa, Oklahoma, allowed its da Vinci robot service contracts with Intuitive to expire for its two robots at Hillcrest Medical Center and its one robot at Hillcrest Hospital South. Ardent had not been having any problems with the robots. Intuitive was aware that Hillcrest was considering Restore for its da Vinci robot service.

73.     On December 27, 2019, Intuitive removed Hillcrest from the customer portal and placed the three robots on time-and-materials status for any robot service, which includes a travel and labor rate of $995 per hour. On that same day, Hillcrest Medical Center noticed a blank vision cart touchscreen on one of its robots. Intuitive informed Hillcrest that the monitor needed to be replaced and quoted time and materials of more than $25,000. Hillcrest hired Restore to troubleshoot the issue. On January 11, 2020, Restore installed a new power supply for the touchscreen monitor and confirmed that the robot was fully functioning. The price was $7,100.

74.     On January 14, 2020, Hillcrest reported an issue with a robot arm on the robot at Hillcrest Hospital South. Intuitive informed Hillcrest that it would cost more than $100,000 to replace the arm plus an additional sum for preventative maintenance for the robot to be operational. Hillcrest contacted Restore to troubleshoot the issue. Restore informed Hillcrest that Restore could

replace the arm if necessary but did not have the toolkit to access the robot software and input the serial number for the replacement arm. Intuitive would have to input the serial number for any replacement arm for the robot to be operational.

75.     On January 16, 2020, Restore was able to repair, rather than replace, the robot arm for $3,975. The robot was operational but had two remaining error codes. Restore could not troubleshoot the remaining errors without access to the software on the robot and informed Hillcrest that it would need to contact Intuitive regarding the remaining error codes.

76.     On January 17, 2020, Kara Andersen Reiter, Intuitive Senior Vice President and General Counsel, and Romain St. Denis, Intuitive Vice President, notified the Chief Executive Officer, the Vice President of Risk Management, and the Chief Medical Officer of Ardent Health Services in writing that Intuitive had learned that Ardent was "having or intends to have" its da Vinci robots serviced by an "unauthorized third party."

77.     In the letter, Intuitive explained that third parties did not have the "software tools necessary for proper System maintenance." Intuitive further stated that "Intuitive may no longer accept your service calls for Systems that were previously serviced by an unauthorized third party. Should Intuitive or its personnel determine, after having accepted a service call or a purchase order for a service call, such as after an Intuitive Field Service Engineer arrives at your site for a service call, that the System has been previously serviced by an unauthorized third party, Intuitive may not provide service for such a System."

78.     On January 30, 2019, Chris Goss, the Intuitive field service engineer responsible for Hillcrest, contacted the surgery manager at Hillcrest Medical Center in Tulsa, Oklahoma. Mr. Goss explained he could monitor the robot remotely and threatened to shut down the da Vinci robots at Hillcrest if the hospital signed a service contract with Restore.  Mr. Goss said Intuitive would make Hillcrest's robots "a big paper weight" if Hillcrest chose to use a third party for its robot service.

79.     Shortly thereafter, the robot ceased to function in the middle of a procedure. The surgeon had to convert the procedure to open surgery with the patient on the operating table.

Afterwards, Hillcrest disconnected the data cable that provides the remote connection between the robot and Intuitive.

80.     On May 6, 2020, Hillcrest contacted Restore to troubleshoot a robot arm on the da Vinci robot in one of its operating rooms at Hillcrest Medical Center. Restore reminded Hillcrest that Intuitive would have to perform any repair of the robot arm because the repair or replacement of the arm would require access to the robot software through the service laptop and the service keys and that Intuitive does not provide such access to the owner or third-party servicers.

81.     On May 7, 2020, Hillcrest contacted Intuitive for repair of the robot arm on a time-and-materials basis. Intuitive quoted an initial price to troubleshoot the arm. Ardent approved the quote. Later that day, Intuitive revised its quote to include an additional sum for preventative maintenance. Early on May 8, 2020, Ardent approved the work order.

82.     Later that day, Intuitive instructed its field service engineer to cease the repair of the robot arm because the engineer observed that other parts elsewhere on the robot had not been installed by Intuitive. On May 11, 2020, Intuitive demanded that Ardent agree to the removal of any parts that had been replaced or repaired by anyone other than Intuitive and pay the additional sum to Intuitive for "preventative maintenance" on the robot, in addition to the cost of the repair of the arm, before Intuitive would restore functionality to the robot. In fact, the sole "part" that Restore had replaced was the battery, which Restore had replaced with the exact same model from the exact same battery manufacturer.

83.     On May 12, 2020, Ardent agreed to the demands and beseeched Intuitive to "fix the robot ASAP." Shortly thereafter, Ardent signed a one-year service contract with Intuitive for the robot in question at Hillcrest retroactive to the prior contract expiration date of December 27, 2019 at a price of more than $100,000.

84.     As a result of Intuitive's exclusionary conduct, Intuitive faces barely any competition in this aftermarket. Restore, for example, has less than $1 million in annual revenue in da Vinci robot services. And because all other actual and potential competitors in this aftermarket face the same anticompetitive tactics from Intuitive, Intuitive has maintained a market share in da Vinci robot parts and service of more than 99% domestically for nearly 20 years.

CLASS ACTION COMPLAINT

1    Moreover, Intuitive is able to charge supracompetitive prices for da Vinci robot parts and service.

2    Intuitive routinely charges roughly double the rates offered by third parties for the same services.

3    **IV.    Intuitive's Monopolization of the Aftermarket for Replacements and Repairs of EndoWrists**

4

5    85.    Intuitive uses similar tactics to unlawfully monopolize the aftermarket for

6    replacements and repairs of EndoWrists. Because Intuitive faces no meaningful competition in the

7    primary market for minimally invasive surgical robots, or the related aftermarket for parts and

8    service of the da Vinci surgical robot, Intuitive can and does exploit purchasers of da Vinci robots

9    when it comes to replacements and repairs of the EndoWrists used with those robots. Intuitive's

10   exclusionary and anticompetitive conduct forces hospitals to purchase far more EndoWrists, at far

11   higher prices, and to replace them far sooner, than they would in the absence of that conduct.

12   **A.  The Aftermarket for Replacements and Repairs of EndoWrists**

13   86.    There is an aftermarket for replacements and repairs of EndoWrists that is separate

14   from the market for minimally invasive surgical robots and the aftermarket for da Vinci robot parts

15   and service. As with the market for minimally invasive surgical robots, FDA regulations foreclose

16   the possibility of hospitals turning to foreign instruments as substitutes for EndoWrists. And as

17   with the aftermarket for da Vinci robot parts and service, Intuitive's only competitors in the

18   aftermarket for replacements and repairs of EndoWrists are domestic. Accordingly, the relevant

19   geographic market for the aftermarket for replacements and repairs of EndoWrists is nationwide.

20   87.    Intuitive has used its monopoly power in the primary market for minimally invasive

21   surgical robots, and its monopoly power in the aftermarket for da Vinci robot parts and service, to

22   create a separate monopoly in the aftermarket for replacements and repairs of EndoWrists.

23   88.    As explained above, EndoWrists are the Intuitive-branded surgical instruments

24   required to perform surgery with a da Vinci surgical robot. These are the instruments, such as

25   graspers, forceps, and scissors, that actually come into physical contact with patients.

26   89.    EndoWrists are manufactured by Intuitive and sold only by Intuitive in the U.S.

27   They are the only instruments cleared by the FDA for use with the da Vinci robot system. FDA

28   approval is required for any instrument to be used in conjunction with a da Vinci robot in the

22

United States. Any third party seeking to create surgical instruments for use with the da Vinci robot would need Intuitive's cooperation in order to obtain that approval. On information and belief, Intuitive has never cooperated or agreed to cooperate with a third party for this purpose.

90.     Before releasing its EndoWrists to market, Intuitive told the FDA that the EndoWrists and traditional instruments "are essentially identical . . . in terms of shape, size, function, and tissue effect"; "are substantially equivalent in intended use and/or method of operation"; and "demonstrate substantial equivalence … in terms of safety and effectiveness." The FDA agreed and "determined the [EndoWrist] device" is "substantially equivalent" to the traditional devices.

91.     Nevertheless, Intuitive requires that any surgical instrument attached to the da Vinci surgical robot have a serial number generated by Intuitive, which Intuitive does not provide to third parties. Because surgical instruments are necessary to perform surgery, Intuitive's design means that customers must purchase EndoWrists to perform surgeries using the da Vinci robot.

92.     EndoWrists are a separate product from da Vinci robots themselves. Although the two are complementary products, there is demand for replacement EndoWrists separate from demand for da Vinci robots, and Intuitive sells replacement EndoWrists separately from da Vinci robots, in part because EndoWrists may wear out over time and need repair or replacement. To facilitate the sale of replacement EndoWrists, Intuitive has separate sales divisions with separate sales personnel for da Vinci robots and EndoWrists.

93.     Intuitive itself distinguishes between da Vinci robots and EndoWrists as separate products with separate revenue streams. For example, it has stated in SEC filings that "[w]e generate revenue from both the initial capital sales of da Vinci Surgical Systems as well as recurring revenue, derived from sales of instruments, accessories and service. . . . We generate recurring revenue as our customers consume our EndoWrist and Single-Site instrument and accessory products used in performing procedures with the da Vinci Surgical System."

94.     Intuitive derives a large and growing percentage of its revenue from the sale of EndoWrists. According to Intuitive's public regulatory filings, the company derived 52.68% of its

revenue from EndoWrists in 2018, 53.77% of its revenue from EndoWrists in 2019, and 56.34% of its revenue from EndoWrists in 2020.

95.     As detailed below, Intuitive imposes arbitrary caps on the number of times an EndoWrist may be used and requires customers to purchase brand new EndoWrists once that limit has been reached, even if the EndoWrist remains in perfect condition. The most common limit for an EndoWrist is ten uses.

96.     An alternative to purchasing new EndoWrists is repairing EndoWrists a hospital already owns; however, Intuitive has stifled competition in the aftermarket for both replacements and repairs of EndoWrists.

97.     The instruments used in traditional minimally invasive surgeries are cleaned and inspected before and after each surgery. If needed, the instruments are repaired between surgeries—for example, scissors may be sharpened or graspers may be realigned. The instruments are used for hundreds of surgeries, and often last for years.

98.     Because EndoWrists and traditional instruments are similar in many ways, including as to their surgical ends, EndoWrists likewise could be used for dozens—and in some cases over 100—surgeries, if inspected and repaired as needed between surgeries. The FDA permits servicing of approved medical devices by third parties. In such cases, third-party service providers repair instruments to meet their original intended use without affecting the safety and effectiveness of the instrument or its indications for use. The instrument is maintained at, or returned to, its original safety and effectiveness. After undergoing third-party service, EndoWrist instruments have passed third-party simulated life-testing to 50 or more additional uses. This is consistent with the fact that EndoWrists, used for training purposes, commonly last for well over 100 uses, as described below. However, Intuitive takes active measures to preclude EndoWrists from having this longevity for their customers.

99.     There are substantial barriers to entry in the aftermarket for replacements and repairs of EndoWrist instruments. An EndoWrist-replacement instrument cannot work with a da Vinci robot unless it has a serial number from Intuitive—a technological tie that effectively forecloses third parties from manufacturing substitutes for EndoWrists. Intuitive's standard sales

contract for da Vinci robots prohibits the customer from using the robot with any surgical instruments not made by or approved by Intuitive. The FDA and foreign regulatory agencies have rigorous processes for approving any surgical robot instruments for sale. Moreover, as detailed below, Intuitive undertakes various anticompetitive measures to further its monopoly by prohibiting any EndoWrist repairs.

100.   As set forth herein, Intuitive has unlawfully monopolized the market for EndoWrist repairs and replacements. Certain third-party service providers have attempted to provide repair services for EndoWrists to hospitals and other purchasers of da Vinci robots. But Intuitive has effectively and unlawfully blocked all such competition, to the detriment of hospitals and other purchasers of da Vinci robots and EndoWrists. This conduct has caused da Vinci customers to purchase far more replacement EndoWrists than necessary and artificially inflated the prices of EndoWrists. Moreover, Intuitive's scheme has freed it from any competitive pressure to make the investments necessary to improve the quality of replacement EndoWrists.

101.   In spite of this unlawful and exclusionary conduct, a small number of third-party service providers offer EndoWrist repair services to hospitals and other purchasers of da Vinci robots. Surgical instrument refurbishment is commonly relied on by hospitals and surgery centers. According to an FDA report from 2018, thousands of firms offered medical device maintenance, and market experts estimate the global market generates between $28.97 billion and $35.3 billion in revenue annually. Not only is this market sizable, but it is indispensable to the healthcare industry in this country. According to the FDA, the "continued availability of third party entities to service and repair medical devices is critical to the functioning of the U.S. healthcare system," and third party entities "provide high quality, safe, and effective servicing of medical devices." Within that market, the maintenance of surgical instruments is expected to see the highest annual growth rate in coming years, according to one market research service.

102.   Surgical Instrument Services, Inc. ("Surgical") is a veteran of the medical device maintenance industry that recently has made efforts to enter the aftermarket for the replacements and repairs of EndoWrists. Surgical has 50 years of experience servicing surgical instruments and equipment, ranging from simple devices such as forceps and scalpels to complex

electromechanical devices such as flexible video endoscopes, powered orthopedic devices, and surgical video systems. In recent years, Surgical created a program for the inspection and repair of EndoWrist instruments. Surgical's repair procedures include an initial disassembly and inspection, checking the mechanical operation and integrity of all mechanical components, an electrical integrity check to confirm electrical insulation, cleaning, sharpening, or alignment of the instrument tip, and a series of tests to confirm that all the movements of the instrument tip are within original specifications. Surgical also sets the counter to a value corresponding to the initial setting of a new EndoWrist instrument.

103.     These procedures are similar to procedures that Surgical has performed for decades on dozens of types of surgical instruments and medical devices of similar or greater complexity. The materials of the EndoWrist instruments are the same medical grade materials that typically last through hundreds of surgeries and autoclave cycles in other surgical instruments and in medical devices. Particularly after completion of Surgical's rigorous set of procedures, the EndoWrist instruments are suitable for many more uses, and at least a number of uses equivalent to Intuitive's originally specified use limit. In fact, independent testing has shown that EndoWrist instruments serviced by Surgical are suitable for 50 or more uses. Nonetheless, Surgical returns the counter value to the original value specified by Intuitive.

104.     Surgical charges approximately 30–45% less per EndoWrist than what a hospital would have to pay to buy a replacement EndoWrist from Intuitive. And Surgical has the experience, facilities, equipment, and personnel to perform inspection and repair for EndoWrists nationwide. Surgical's services were sufficiently attractive that, based on its initial contracts with hospitals and health care systems, Surgical was prepared to service at least 1,500 EndoWrists a month—and had capacity to service thousands more.

105.     Surgical's initial foray into the market was successful. Although Surgical did not contact potential customers until 2019, by 2020 Surgical expected tens of millions of dollars in sales for the replacements and repair of EndoWrists. Surgical had obtained and was in the process of repairing EndoWrists from some of its initial customers before Intuitive began pressuring those customers to abandon their efforts to secure the cost savings offered by Surgical's services.

Nevertheless, before Intuitive pushed Surgical out of the aftermarket for replacements and repairs for EndoWrists, Surgical repaired EndoWrists that were successfully used in surgeries without any problems or incidents.

106.    Another third-party EndoWrist servicer is Restore, which also services the da Vinci robot itself, as described above. Restore began to offer EndoWrist repair services in 2018. To offer its repair services as a substitute to purchasing new replacement EndoWrists, Restore paid a sizable license fee for technology to reset the use counter on the EndoWrist instruments compatible with the da Vinci Si robot systems. Restore offers repair (including use-counter reset) rates that are at least 25% on average below the replacement EndoWrist prices offered by Intuitive. But for the anticompetitive conduct of Intuitive, Restore would be able to offer even lower repair rates and repair services on many more EndoWrist instruments.

107.    Rebotix Repair ("Rebotix") is another third-party servicer of EndoWrists. Rebotix has invested substantial time, resources, and money (millions of dollars) to develop a means by which it can service EndoWrists. When Rebotix repairs EndoWrists, Rebotix includes a Rebotix Interceptor, which resets the use counter for memory-wipe purposes while maintaining the ability of the da Vinci robot to access the data in the chip's memory and to count uses as usual. The Rebotix Interceptor only resets the use count; it does not interfere with any other communications the robot makes with the EndoWrist. The intended use, method of use, functionality, and performance of the EndoWrist are not changed in any way by this service. Rebotix provides hospitals with approximately 40% savings on their EndoWrist expenses.

108.    Despite the efforts of these third-party servicers to enter the market, Intuitive's anticompetitive behavior has enabled it to maintain at least a 99% market share in the aftermarket for replacements and repairs of EndoWrists.

**B.    Intuitive's    Anticompetitive    and    Exclusionary    Conduct    in    the Aftermarket for Replacements and Repairs of EndoWrists**

109.    Through exclusionary and anticompetitive conduct, Intuitive uses its dominance in the primary market for minimally invasive surgical robots, and the aftermarket for da Vinci robot parts and service, to monopolize the separate aftermarket for replacements and repairs of

EndoWrists. Intuitive has engaged in this conduct ever since the introduction of EndoWrists, in or around 2001 and potentially earlier.

110.   Intuitive's conduct in the aftermarket for replacements and repairs of EndoWrists is not constrained by competition in the market for minimally invasive surgical robots, or the aftermarket for da Vinci robot parts and service, because of Intuitive's monopoly in each of those markets. Intuitive thus is able to leverage its monopoly power in those markets to extract exorbitant sums for the comparatively simple EndoWrists required to perform surgery with a da Vinci robot.

111.   Although Intuitive maintains a significant patent portfolio in its surgical robots, any blocking patents for its EndoWrists are long expired. Intuitive maintains a "Patent Notice" web page for its products. Virtually all of the patents covering core structure and operations for the "EndoWrist" and "Accessories" are expired. The few patents that remain in force are related to specific instrument implementations and could not block a third party from selling competing instruments for use with Intuitive da Vinci robots. But instead of competing on price or quality in the aftermarket for EndoWrists, Intuitive protects its monopoly in that aftermarket through the anticompetitive contractual and technological schemes described below.

112.   As a result of the anticompetitive conduct detailed below, which includes contractual and technological tying to preclude repair of EndoWrists, Intuitive is able to exclude potential competitors, require hospitals and other purchasers of da Vinci robots to purchase far more replacement EndoWrists from Intuitive than necessary, and maintain supracompetitive EndoWrist prices. Intuitive enjoys a monopoly in the aftermarket for replacements and repairs of EndoWrists, and has extracted billions of dollars in undue monopoly rents from hospitals and other purchasers of da Vinci robots.

113.   Because Intuitive has monopolies in the market for minimally invasive surgical robots and the aftermarket for the parts and service required to operate those robots, there is insufficient competition in those markets to discipline Intuitive's anticompetitive behavior in the aftermarket for replacements and repairs of EndoWrists.

CLASS ACTION COMPLAINT

114.    Intuitive's monopolization of the aftermarket for EndoWrist replacements and repairs has taken several forms, including: (1) contractual tying, (2) technological tying, and (3) aggressive enforcement of these tying arrangements.

### 1.    Contractual Tying

115.    Intuitive contractually ties its provision of da Vinci surgical robots and maintenance services to each customer's purchase of new EndoWrists as the exclusive means to continue using the customer's da Vinci robot (i) if and when the customer's EndoWrists fall out of perfect condition and, in any event, (ii) once the customer's EndoWrists reach their arbitrary use limits. Intuitive generally includes these contractual provisions in one or both of (i) the Sales and License Agreement for its da Vinci surgical robot and (ii) the Service Agreement for those da Vinci robots. These provisions combine to restrict competition in the aftermarket for replacements and repairs of EndoWrists and thereby dramatically increase the number of new EndoWrists Intuitive's customers must buy.

116.    Intuitive's standard Sales and License Agreement for the da Vinci surgical robot expressly prohibits its customers from performing repairs on the EndoWrists—for example, sharpening the scissors or aligning the graspers. In other words, Intuitive forces customers to commit to purchasing EndoWrist instrument replacements from Intuitive (rather than instrument service from third parties) to get the da Vinci robot system. The Service Agreement for the da Vinci surgical robot—which sometimes is combined with the Sales and License Agreement— similarly provides that if any third party repairs the instruments, Intuitive no longer is obligated to service the da Vinci robot itself. In addition, under the Service Agreement any third-party service on an EndoWrist instrument voids Intuitive's one-year warranty not just on that EndoWrist but on the entire da Vinci robot system.

117.    Intuitive's standard Sales and License Agreement further ties the purchase of a da Vinci robot to a "maximum number of uses" requirement for EndoWrists. That agreement provides that the customer "purchases" any instruments for use with the robot system, and requires that the customer use those instruments only for the "maximum number of uses" set forth in the instrument catalog. These provisions require customers whose EndoWrists have reached their "maximum

number of uses" to purchase new EndoWrists—regardless of whether the used EndoWrists are in perfect condition or could be returned to such condition through routine repairs. During the relevant time period, the most common use limit for EndoWrists was ten. But, as detailed below, the safe and usable life of an instrument far exceeds the maximum number of uses designated by Intuitive. For example, forceps that are periodically inspected and, if necessary, aligned or adjusted can still be in perfect condition after well over 100 uses. Forceps maintained in this fashion are functionally indistinguishable from new EndoWrists. But, because of Intuitive's standard Sales and License Agreement, hospitals are contractually obligated to buy many more (10 to 20 times as many) EndoWrists from Intuitive than they actually would need if the restrictive tying clause were eliminated. The clause prevents hospitals from using the services of third-party service providers to safely extend the life of their EndoWrists beyond the use limits arbitrarily set by Intuitive.

118.    Hospitals have long repaired, rather than replaced, the laparoscopic instruments that are similar in many ways to EndoWrists. But instead of permitting hospitals to repair EndoWrists—which is the standard procedure used for the substantially identical non-robotic versions of these surgical instruments—Intuitive requires hospitals to discard EndoWrist scissors that may need sharpening, graspers that may need aligning, and, in most circumstances, EndoWrists that are perfectly fine and in no need of repairs. Intuitive forbids hospitals from using repair services of third-party service providers; instead, they must buy new, replacement EndoWrists from Intuitive.

## 2.    Technological Tying

119.    Intuitive has reinforced these contractual ties with technological ties. Specifically, Intuitive included specific design features in its EndoWrists whose sole purpose is to exclude competitors from the aftermarket for replacements and repairs of EndoWrists and to allow Intuitive to maintain its monopoly in that aftermarket and extract monopoly rents.

120.    For example, in order to enforce the "maximum number of uses" requirement for EndoWrists in its standard agreement for the sale and servicing of a da Vinci robot, Intuitive includes a programmed memory chip in each EndoWrist that counts the number of times the EndoWrist is attached to a da Vinci robot, and then renders the EndoWrist non-functional after an

Intuitive-specified number of uses. After the memory chip reaches the count determined by Intuitive, the memory chip is wiped, preventing the EndoWrist from communicating with the da Vinci device and rendering the instrument inoperable. This memory-wipe forces Intuitive customers to discard EndoWrists and purchase new ones after a given number of uses—usually ten but as few as five—even when the EndoWrists are maintained at or better than their original levels of safety and effectiveness.

121.    The use-triggered memory-wipe of EndoWrists is not based on considerations of safety or effectiveness. All components of the EndoWrists are medical-grade materials that are capable of many times the number of uses permitted by Intuitive. The memory chip does not monitor the safety or durability of EndoWrists—the chip does not, for example, determine whether components of the EndoWrist have become unresponsive to requested movement. Instead, the memory chip tracks only the number of times the EndoWrist is attached to a da Vinci robot arm. Through the memory-wipe function of this memory chip, Intuitive causes EndoWrists to become inoperable long before they otherwise would wear out. This programmed premature obsolescence severely inhibits competition for EndoWrist repairs and enables Intuitive to extract additional profits from its customers, who are forced to buy additional EndoWrists at supracompetitive prices.

122.    The use limits are not based on any FDA or other regulatory requirement. As set forth above, Intuitive's premarket notifications to the FDA for the EndoWrist instruments represented to the FDA that they were "essentially identical" to their precursor traditional laparoscopic instruments, which did not include any use limits, and which can safely be used for more than 100 surgeries. And the FDA approved the EndoWrists on that basis.

123.    Intuitive's 510(k) premarket notification summaries to the FDA do not reference any tests showing that EndoWrists begin to lose their functionality at any predictable number of uses, much less the specific low use limits set by Intuitive.  Nor do they refer to any tests showing that servicing the instruments would not maintain their safety and effectiveness for additional uses.

124.    Intuitive's standard contracts and instrument catalogs do not refer to any regulatory requirement mandating use limits.

125.    The use limits are not based on any clinical or scientific determination of the useful life of the instruments. Intuitive has not released to the public, nor does it provide to its customers, any clinical data that supports its EndoWrist use limits. In addition, analogous surgical instruments used by other surgical robots do not have use limits. For example, the TransEnterix Senhance robot uses surgical instruments (depicted below) that are substantially the same as Intuitive's EndoWrists. And the TransEnterix surgical instruments do not have arbitrary, contractually or technologically imposed, use limits.



126.    Similarly, the analogous surgical instruments used by the Medrobotics' Flex robot (depicted below) do not have arbitrary, contractually or technologically imposed, use limits.



CLASS ACTION COMPLAINT

127.   Moreover, doctors and hospitals who have used EndoWrists beyond their programmed use limits (*i.e.*, after being inspected and repaired by third-party service providers who also reset the memory chip's use counter) report that the EndoWrists perform as well as, if not better than, when they were new.

128.   Intuitive's own instrument catalogs demonstrate that the EndoWrists' useful lives are much longer than their use limits. Intuitive offers the exact same instruments (with the exact same materials and specifications) labeled for training. Yet Intuitive sets much higher use limits for the training instruments. The industry does not distinguish between an instrument sold for clinical use and the same instrument sold for training use. Training instruments, like instruments for clinical use, must retain their functionality for the surgeon during use. The only difference is the generation of revenue for hospitals on a surgical procedure for an instrument in clinical use, which allows Intuitive to set a much lower use limit and higher price in order to generate a much higher per-use fee for the instruments in clinical use. For example, the Potts Scissors EndoWrist sold for use in training has a use limit of 30, but the same Potts Scissors EndoWrist sold for use in surgery has a use limit of ten.

129.   Indeed, whereas Intuitive places an artificial use limit of ten on many EndoWrists, Intuitive employees conducting training sessions have used these same EndoWrists 100 to 150 times without issue.

130.   Intuitive has in fact admitted that the artificially limited lifespan of EndoWrists is intended to boost Intuitive's recurring revenue. During a 2005 presentation and Q&A session, Lonnie Smith, then Intuitive's CEO, discussed the ten-use limit on EndoWrists and touted the resulting recurring revenue streams it generated for Intuitive. Asked what made the EndoWrists usable only ten times, Smith responded that "part of it was, is to make it economically feasible as a company, I mean viable as a company because one of our competitors, our competitor, the one that failed, had very little recurring revenue stream, almost none . . . . And so it was part of our business model as well." Intuitive has similarly called its da Vinci business model a "razor/razor blade" model, with recurring revenues from replacement EndoWrists being a key revenue driver, similar to how razor manufacturers notoriously generate far greater revenue on replacement blades

than on the razors themselves. In sharp contrast to razor manufacturers, though, Intuitive possesses monopoly power in the market for surgical robots and has leveraged that monopoly power in the primary market to insulate itself from competition in the complementary consumables aftermarket. And, as detailed above, Intuitive has been successful in executing on this strategy: thanks to its predatory and exclusionary conduct, a growing majority of Intuitive's revenue (today, close to 60%) is derived from sales of the comparatively simple EndoWrists.

131.    Moreover, even though third-party servicers such as Surgical, Restore, and Rebotix have the expertise to enter the aftermarket for replacements and repairs of EndoWrists, Intuitive has designed both the da Vinci surgical robot and the EndoWrists in order to inhibit the ability of these third-party servicers to compete in that aftermarket.

132.    *First*, Intuitive's intentional design choices for EndoWrists—including the condition that each EndoWrist have an Intuitive-provided serial number to communicate with a da Vinci robot and the use of a memory-wipe triggered by an Intuitive-set number of uses—forced Surgical, Restore, and Rebotix to invest significant time and resources to develop various means to attempt to overcome the anticompetitive barriers Intuitive had built and compete in the aftermarket for replacements and repairs of EndoWrists.

133.    *Second*, Intuitive has re-designed its memory chip to strengthen its exclusionary technological ties in EndoWrists compatible with its newer X and Xi model robots, and is in the process of using its monopoly power in the market for surgical robots and the aftermarket for da Vinci parts and service to force customers to transition to the newer models. The solutions discovered by Restore and Rebotix to overcome the anticompetitive barriers Intuitive had built work only for EndoWrists used with the older da Vinci models (the S and Si models), not the newer, X and Xi models. Intuitive re-designed the memory chip installed in EndoWrists for the X and Xi models solely to prevent any third parties (including Restore and Rebotix) from servicing EndoWrists. Intuitive has further withdrawn its support for certain S and Si instruments and announced, in writing, its intention to discontinue production of all S and Si instruments and technical support for the da Vinci S and Si in 2023. In this way, Intuitive is forcing its customers

to switch to the da Vinci X and Xi robot systems. Intuitive also raised the prices for some number of EndoWrists with the introduction of the X and Xi models.

134.   *Third*, Intuitive has unilaterally changed counter values for certain EndoWrists by, among other things, changing the instructions for use ("IFU") for EndoWrists to force early replacement, even if the (already arbitrary) use limit has not been reached. For example, Intuitive issued an IFU for EndoWrist instruments setting a maximum number of autoclave cycles. Because of the way that da Vinci surgeries are prepped and performed, EndoWrists often have to undergo an autoclave cycle even if not actually attached to a robot during surgery. The specified limit on autoclave cycles is extremely low compared to comparable devices made of similar medical grade materials. These unilateral changes substantially increase the per-surgery cost of EndoWrist instruments to hospitals, and Intuitive's supra-competitive EndoWrist profits, without prior notice to hospitals. When hospitals make the substantial capital and contractual commitment to purchase a da Vinci robot, they are unaware of these additional costs and lack information to predict Intuitive's unilateral changes. And, because Intuitive does not provide hospitals any option for repair of the EndoWrist instrument after the use limit has been reached, Intuitive's unilateral changes to the IFU narrow the window in which third-party servicers may repair EndoWrists before the memory-wipe renders them inoperable.

135.   Doctors and hospitals have frequently criticized and complained about the excessive cost and stingy use limits of EndoWrists. Hospitals and other purchasers of EndoWrists have expressed interest in repairing and otherwise extending the longevity of EndoWrists in order to save on costs and would do so but for the restrictions imposed by Intuitive. Hospitals are not guaranteed full recovery of and reimbursement for da Vinci-related expenditures and surgeries, including because some insurers will not reimburse for the full cost of da Vinci robot surgeries given their excessive costs and lack of objective superiority to cheaper laparoscopic alternatives.

### 3.   Intuitive's Aggressive Enforcement

136.    To maintain this source of massive revenues from its EndoWrist sales, Intuitive actively and fiercely enforces the anticompetitive restrictions imposed by these contractual and technological tying arrangements.

137.    As detailed below, when hospitals elect to use third-party service providers to repair their EndoWrists rather than purchase new ones, Intuitive representatives threaten to withhold maintenance services from the hospital should the hospital continue to make such repairs rather than purchase more EndoWrists from Intuitive. Similarly, when hospitals elect to use an EndoWrist beyond the limit set by Intuitive, Intuitive representatives threaten to withhold maintenance services for the hospitals' da Vinci robots.

138.    These threats and coercive tactics have succeeded. Hospitals are dependent on robot maintenance services for the continued operation of their da Vinci robots. The services include "provid[ing] and install[ing] Software upgrades"; "replac[ing] defective malfunctioning System parts"; and "replac[ing] and install[ing] Software, Hardware, and mechanical parts for safety." Each of these services can be obtained only from Intuitive. And if these services are not provided— *e.g.*, if a malfunctioning part is not replaced or the Software is not up-to-date—the da Vinci will display a "NEEDS SERVICE" warning message on the display panel. Doctors will not perform a surgery with a machine indicating that it "NEEDS SERVICE." Nor will patients allow themselves to be operated upon by a machine that "NEEDS SERVICE." Accordingly, when service is needed, the da Vinci robot is effectively rendered useless until service is provided. Hospitals cannot afford to have useless da Vinci robots. Da Vinci robots are large capital investments, and ongoing da Vinci surgeries are necessary to recoup that investment. Functional da Vinci machines also are necessary to maintain the goodwill of the doctors and patients who have scheduled robotic surgeries.

139.    Intuitive's response to Surgical's efforts to enter the aftermarket for replacements and repairs of EndoWrists vividly demonstrates its aggressive tactics in protecting its unlawful monopoly in that aftermarket. Intuitive became aware that Surgical was providing owners of da Vinci surgical robots with repaired EndoWrists in late 2019, and began sending letters to and visiting Surgical's customers and potential customers. As a result of the threats and misleading

statements in those letters and conversations, ***all*** of Surgical's EndoWrist customers and potential customers backed out of their contracts or did not sign contracts under negotiation, effectively eviscerating Surgical's EndoWrist repair business.

140. In letters to Surgical's customers and potential customers, Intuitive claimed that repairs might lead to "degraded performance," including "unintuitive motion," "insufficient grip force," "dull or damaged scissor blades," and "worn/damaged cables." To the contrary, under Surgical's procedures all of these aspects of EndoWrist performance, and numerous others, are inspected in detail and repaired as necessary to meet Intuitive's original equipment specifications.

141. Intuitive also alleged that "third party manufacturers or refurbishers may use non-validated or incompatible cleaning agents and/or disinfection/sterilization processes" or "may damage the instrument's internal mechanisms that interface with the robotic system and allow Intuitive to monitor the device." To the contrary, with years of experience working with millions of diverse devices that require sterilization procedures, Surgical's processes do not employ "incompatible cleaning agents and/or disinfection/sterilization processes." Nor would Surgical return a device to the customer that was damaged or could not interface properly with Intuitive's robotic system.

142. Intuitive further asserted numerous threats and misleading statements by letter and in private conversations to prevent Surgical from performing its repair services, and to maintain Intuitive's monopoly profits in EndoWrists.

143. A first set of Intuitive's misleading statements made by letter relates to FDA clearances. Couched in terms of "might prevent such products from performing" such that FDA and other regulations "may not apply," Intuitive states without any basis that "the hospital has no way to know whether the refurbished instrument meets the rigorous specifications" of Intuitive and the FDA. Intuitive also states that "any modification to allow for use of a da Vinci product beyond its useful life exceeds the scope of the original clearance by expanding the FDA cleared indications for use" in violation in 21 U.S.C. § 351.

144. The components of the EndoWrists are medical grade parts with a useful life of dozens if not hundreds of uses. They will operate within specification, particularly when properly

1  inspected and repaired as is performed by Surgical. Intuitive's allegation appears to be that use of

2  EndoWrists beyond the counter limit is a violation of Intuitive's FDA clearances. Based on FDA

3  clearances that have been identified for EndoWrists to date, such an assertion is incorrect. At most,

4  Intuitive merely mentions in its FDA applications that its devices have use limits. Available 510(k)

5  summaries are silent on use limits and have no prohibitions whatsoever on repair.

6       145.    A second misleading statement made by letter relates to unspecified "intellectual

7  property rights in the da Vinci systems and its instruments" that "Intuitive believes it has[.]"

8  Surgical merely repairs EndoWrists, which according to Intuitive's own Patent Notice webpage

9  do not have any relevant patent rights that would cover Surgical's services. Nor are there any other

10  intellectual property rights that Surgical's services would infringe.

11       146.    Intuitive's letters also inform Surgical customers of certain "terms of [the

12  customer's agreements with Intuitive] that you might wish to consider." According to Intuitive,

13  such terms include prohibitions on "repair, refurbishment, or reconditioning" and another Intuitive

14  letter asserts that the hospital's "license [for an EndoWrist] expires once an Instrument or

15  Accessory is used up to its maximum number of uses[.]" Another term referenced by Intuitive

16  states that the hospital will not "permit any third party to, modify, disassemble, [or] reverse

17  engineer . . . the System or Instrument or Accessories." Failure to comply with the latter term

18  results in termination of the hospital's "Agreement immediately upon written notice, and any

19  warranties applicable to the system will become void."

20       147.    Notably, the Agreement that Intuitive is referring to and the remedies it is

21  threatening are for the "System," *i.e.*, the surgical robot. These terms constitute attempts by

22  Intuitive to constrain its customers with illegal exclusive dealing agreements and constitute illegal

23  tying of the original purchase of the da Vinci robot to replacement EndoWrists. These provisions

24  are particularly egregious in view of Intuitive's monopoly power in the market for minimally

25  invasive surgical robots. The effectiveness of its exclusive dealing and tying requirements is

26  proven by Intuitive's monopoly power in the aftermarket for replacements and repairs of

27  EndoWrists, and its ability to completely foreclose refurbishing companies from competing in that

28  aftermarket.

148. Intuitive's letters make its threats explicit—if the hospital uses repaired instruments, Intuitive will render its surgical robot inoperable. Not only will Intuitive seek damages or indemnity from its customer, but if Intuitive discovers "Systems being used with instruments by an unauthorized third party, Intuitive may no longer accept your service calls for such Systems." Because Intuitive also refuses to allow any competition in the aftermarket for da Vinci parts and service, and refuses to make error codes and other critical information available to third parties, failure to provide such service will render a robot that originally cost well over a million dollars inoperable. Many hospitals have multiple such robots that would thus be rendered inoperable.

149. Intuitive's letter further states that "[s]hould Intuitive or its personnel determine, after having accepted a service call or a purchase order for a service call, such as after an Intuitive Field Service Engineer arrives at your site for a service call, that the System has been used with instruments refurbished or modified by an unauthorized third party, Intuitive may not provide service for such a System." Again, the threat is explicit—if the hospital uses refurbished instruments, Intuitive will render its surgical robot inoperable.

150. In private conversations, Intuitive representatives have made this threat even more colorful and explicit. Intuitive representatives have threatened customers, including Ardent (the Oklahoma-based hospital system described above), that Intuitive will turn their da Vinci robots into "paperweights" if they use third-party repair services.

151. Intuitive also has aggressively enforced its anticompetitive tying arrangements to attempt to limit Rebotix's ability to compete in the aftermarket for the replacements and repairs of EndoWrists. Similar to its response to Surgical's efforts to enter this market, Intuitive has sent cease-and-desist letters to nearly every Rebotix client. In addition, Intuitive representatives repeat and reiterate these threats.

152. Hospitals that have declined Rebotix's services have explained to Rebotix that they did so because they feared the anticompetitive provisions in their contracts with Intuitive. As for hospitals that did retain Rebotix's services, the relationships were short-lived because of Intuitive's aggressive enforcement of its anticompetitive provisions.

CLASS ACTION COMPLAINT

153.    Intuitive likewise has aggressively enforced its anticompetitive tying arrangements in an attempt to limit Restore's ability to compete. On or about February 12, 2019, Intuitive sent a letter to Restore demanding that Restore "immediately cease and desist" from resetting the use counter after completing servicing an EndoWrist instrument or "contacting Intuitive's customers to offer services related to Intuitive's products."

154.    Intuitive also threatened and coerced Ardent (the Oklahoma-based hospital system described above) into abandoning its plans to use Restore to service its EndoWrists at its Hillcrest hospitals.

155.    Hillcrest had purchased and was using EndoWrist instruments from Restore that had not reached their original use limits and was considering using Restore to service EndoWrist instruments for use beyond their original limits. On January 17, 2020, Kara Andersen Reiter, Intuitive Senior Vice President and General Counsel, and Romain St. Denis, Intuitive Vice President, notified Ardent's Chief Executive Officer, Vice President of Risk Management, and Chief Medical Officer in writing that Intuitive had learned that Ardent was "using or considering using 'refurbished' EndoWrist® instruments . . . beyond the programmed number of uses."

156.    In the letter, Intuitive stated that Intuitive might no longer accept service calls for any da Vinci robot at Hillcrest that was being used with instruments refurbished by an unauthorized third party. Intuitive does not authorize any third party to repair EndoWrist instruments for additional uses. Intuitive stated, "Should Intuitive or its personnel determine, after having accepted a service call or a purchase order for a service call, such as after an Intuitive Field Service Engineer arrives at your site for a service call, that the System has been used with instruments refurbished or modified by an unauthorized third party, Intuitive may not provide service for such a System." Intuitive is able to detect any third-party service of EndoWrist instruments and act on its threat to withhold da Vinci robot service. As a result of those threats, Hillcrest has not serviced EndoWrist instruments with Restore.

157.    Intuitive also has informed customers that they should not sell unused or partially used EndoWrist instruments to Restore or buy such instruments from Restore for use with the da Vinci robot, and that Intuitive would consider any customer that uses such instruments with a da

Vinci robot to have violated its contract with Intuitive. For that reason, hospitals have refused to sell unused EndoWrist instruments to Restore or to its affiliate Clif Parker Robotics LLC ("CPR"), which purchases surgical instruments and resells them, both directly and through Restore. Hospitals have similarly refused to buy such instruments from Restore or CPR. As a general proposition, Intuitive does not object to the sale or purchase of EndoWrist instruments that have not reached their use limits. Intuitive has targeted Restore, and CPR by extension, because Restore has the repair capacity to be a competitive threat to Intuitive in the aftermarket for replacements and repairs of EndoWrists. When West Virginia University Medicine ("WVU") traded in its da Vinci Si robots in December 2019, the hospital considered the sale of its unused EndoWrist Si instruments to CPR. Intuitive informed WVU that the hospital should not sell the instruments to any entity affiliated with Restore.

## EFFECTS OF INTUITIVE'S ANTICOMPETITIVE AND EXCLUSIONARY BEHAVIOR

### I.  General Effects on Competition

158.    Intuitive's anticompetitive conduct has substantially inhibited competition in both the aftermarket for da Vinci robot parts and service and the aftermarket for replacements and repairs of EndoWrists. The impact of Intuitive's behavior on medical repair companies like Restore, Rebotix, and Surgical provides tangible evidence of these effects.

159.    Even in the face of Intuitive's exclusionary tactics, medical repair companies like Restore have developed the expertise to perform repairs and maintenance on the da Vinci robot. Restore, for example, offers da Vinci servicing at an effective rate of as little as half the effective rate charged by Intuitive. Despite the substantial premium that Intuitive charges, Intuitive maintains a stranglehold on the aftermarket for da Vinci parts and service because of its anticompetitive and exclusionary tactics. As a result, Intuitive faces barely any competition in that aftermarket, maintaining at least a 99% market share in that aftermarket while charging supracompetitive prices.

160.    The effects of Intuitive's conduct are similar in the aftermarket for replacements and repairs of EndoWrists. Rebotix, for example, invested substantial time and resources, and

millions of dollars, to develop the Interceptor, which enables resetting the count on the use counter installed by Intuitive on the memory chip of all EndoWrists. The Interceptor allows Rebotix to provide a service that hospitals want: the ability to avoid purchasing unnecessary EndoWrists from Intuitive by having their EndoWrists safely repaired.

161.    Rebotix's and Restore's services are enormously attractive to hospitals. Even in its hobbled state, caused by Intuitive's anticompetitive grip, Rebotix provides hospitals with substantial savings of approximately 40% on their EndoWrist expenses while maintaining the same level of safety and effectiveness.  Hospitals that learned of Rebotix's repair services expressed interest. Hospitals that declined Rebotix's services explained to Rebotix that they did so because they feared the anticompetitive provisions in their contracts with Intuitive. As for hospitals that did retain Rebotix's services, the relationships were short-lived because of Intuitive's aggressive enforcement of its anticompetitive provisions.

162.    Rebotix has filed a lawsuit against Intuitive alleging that conduct similar to that alleged here violated the antitrust laws and harmed Rebotix. On March 8, 2021, the District Court for the Middle District of Florida largely denied Intuitive's motion to dismiss that complaint, holding that Rebotix had stated claims under both Section 1 and Section 2 of the Sherman Act.[1]

163.    Restore has similarly suffered from Intuitive's anticompetitive conduct. Even though its services, including its EndoWrist repair services, are highly appealing to hospitals and other purchasers of da Vinci robots, Restore earns less than $1 million in annual revenue in da Vinci robot services. Intuitive has successfully threatened and coerced Restore and its customers to prevent Restore from repairing da Vinci robots and EndoWrists.

164.    Restore offers EndoWrist repair rates that are at least 25% on average below replacement rates offered by Intuitive. But for the anticompetitive conduct of Intuitive, Restore would be able to offer even lower repair rates and offer repair services on many more EndoWrist instruments.

---

[1] Order, *Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. Mar. 8, 2021), ECF No. 52.

165.   Like Rebotix, Restore has filed a lawsuit against Intuitive alleging that conduct similar to what is alleged here violated the antitrust laws and harmed Restore. On September 16, 2019, the District Court for the Northern District of Florida largely denied Intuitive's motion to dismiss that complaint, holding that Restore had stated claims under both Section 1 and Section 2 of the Sherman Act.[2]

166.   Surgical recently filed a lawsuit alleging that conduct similar to that alleged here violated the antitrust laws and harmed Surgical. Surgical filed its complaint in the Northern District of California on May 10, 2021; as of the date of this filing, Intuitive has not answered or otherwise substantively responded to Surgical's complaint.

## II.      Effects on Hospitals and Other Purchasers of da Vinci Surgical Robots

167.   Intuitive's conduct has harmed hospitals and other purchasers of da Vinci surgical robots. Those robots require regular maintenance and upkeep, and hospitals spend hundreds of millions of dollars each year servicing their da Vinci robots and replacing da Vinci robot parts. Intuitive's anticompetitive and exclusionary conduct substantially inhibits the ability of third-party servicers to compete in the aftermarket for da Vinci parts and service. As described above, hospitals were keenly interested in the services of one such servicer, Restore. But for Intuitive's intimidation of Restore's customers, Restore (and other third-party servicers) would be able to compete with Intuitive more meaningfully. To date that has not happened, however, because Intuitive is able to leverage its dominance in the primary market for minimally invasive surgical robots to unlawfully monopolize the aftermarket for da Vinci parts and service. The result is that hospitals spend roughly double the amount they would pay for da Vinci parts and service absent Intuitive's unlawful tactics.

168.   The impact of Intuitive's behavior is similar in the aftermarket for replacements and repairs of EndoWrists. Because of the anticompetitive restrictions imposed by Intuitive, purchasers of da Vinci robots are unable to repair their EndoWrists or use them beyond the

---

[2] Order Denying Mot. to Dismiss, *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, 5:19cv55-TKW-MJF, 2019 WL 8063989 (N.D. Fla. Sept. 16, 2019).

artificially low number of uses Intuitive allows. Instead, they have been forced to purchase far more replacement EndoWrists from Intuitive than they otherwise would have to purchase—as many as ten times as many instruments as they would purchase absent Intuitive's scheme. And each of those additional, unnecessary purchases were made at supracompetitive prices. Intuitive charges thousands of dollars per replacement EndoWrist on average. Thus, Intuitive's conduct has caused hospitals and other purchasers of da Vinci surgical robots to spend far more money on replacement EndoWrists than they would need to but for Intuitive's conduct.

169.    In addition, Intuitive's conduct has artificially inflated the prices it can and does charge for replacement EndoWrists, and freed it from any competitive pressure to make the investments necessary to improve the quality of replacement EndoWrists. Absent the anticompetitive restrictions it has imposed, Intuitive would have to lower the price of replacement EndoWrists and/or improve their quality and longevity (including longevity separate and apart from use limits) in order to compete with third parties offering the cost-effective alternative of repairing EndoWrists. Otherwise, da Vinci customers would substitute repairing their EndoWrists for buying replacements. Due to the anticompetitive barriers that Intuitive has erected to insulate itself from competition in the aftermarket for replacements and repairs of EndoWrists, though, prices for EndoWrists have been artificially inflated. Thus, Intuitive's conduct has resulted in unlawful overcharges for each replacement EndoWrist sold to hospitals and other purchasers of da Vinci surgical robots.

170.    Intuitive's monopolization of the aftermarket for replacements and repairs of EndoWrists has been enormously profitable for the company. Intuitive generates billions of dollars a year through the sale of EndoWrists—$2.41 billion in 2019 and $2.46 billion in 2020—and relies on those sales for a growing majority of its revenues—53.77% in 2019 and 56.34% in 2020.

## STATUTE OF LIMITATIONS

171.    Intuitive has engaged in a continuing scheme to monopolize the aftermarkets for da Vinci robot parts and service and EndoWrist replacements and repairs. In doing so, Intuitive has committed continuing overt acts in furtherance of that scheme. These acts include tying the sale of da Vinci robots to the purchase of robot parts and service from Intuitive; tying da Vinci robot parts

to the purchase of robot service from Intuitive; requiring customers to enter into multi-year, exclusive robot service agreements with Intuitive; designing the da Vinci to work only with parts with Intuitive serial numbers and refusing to provide such serial numbers to any third parties; restricting access to software necessary to maintain the da Vinci; tying the sale of da Vinci robots to the commitment to abide by EndoWrist use limits and to purchase replacement EndoWrists from Intuitive once those limits are reached; tying the ongoing maintenance of da Vinci robots to the commitment to abide by EndoWrist use limits and to purchase replacement EndoWrists from Intuitive once those limits are reached; requiring da Vinci purchasers not to repair their EndoWrists through independent service providers; selling replacement EndoWrists with use-limit-triggered memory-wipers and at prices inflated by the scheme; threatening and coercing independent repair providers such as Surgical, Restore, and Rebotix; and threatening and coercing hospitals and other da Vinci robot purchasers who have expressed an interest in using third parties to repair da Vinci robots or EndoWrists or using EndoWrists longer than the use limits arbitrarily set by Intuitive.

## CLASS ACTION ALLEGATIONS

172.   Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a) and (b)(3), as representatives of the following two Classes:

> All persons and entities in the United States or its territories who purchased da Vinci parts or services from Intuitive and/or its agents (the "da Vinci Robot Parts and Service Class"). Excluded from the da Vinci Robot Parts and Service Class are Defendant, its employees, parents, and subsidiaries.

> All persons and entities in the United States or its territories who purchased replacement EndoWrists from Intuitive and/or its agents (the "EndoWrist Class"). Excluded from the EndoWrist Class are Defendant, its employees, parents, and subsidiaries.

173.   ***Numerosity.*** Members of the Classes are so numerous that joinder is impracticable. Plaintiffs do not know the exact size of the Classes, but believe that there are thousands of Class members geographically dispersed throughout the United States.

174.   ***Typicality.*** Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes were damaged by the same wrongful conduct of Defendant. Specifically, Defendant's wrongdoing caused Plaintiffs and members of the Classes to

spend more money on da Vinci parts and service and replacement EndoWrists than otherwise would have been necessary.

175. ***Adequacy of Class Representatives.*** Plaintiffs will fairly and adequately protect and represent the interests of the Classes. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Classes. Accordingly, by proving its own claims, Plaintiffs will prove other Class members' claims as well.

176. ***Adequacy of Representation.*** Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs can and will fairly and adequately represent the interests of the Classes and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Classes.

177. ***Commonality.*** There are questions of law and fact common to the Classes, which questions relate to the conduct alleged and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

      a.    Whether Defendant had market or monopoly power in the market for minimally invasive surgical robots;

      b.    Whether Defendant used the sale of the da Vinci robot to ensure its customers entered into multi-year, exclusive service agreements;

      c.    Whether Defendant used the sale of the da Vinci robot to ensure its customers purchased replacement parts from Defendant alone;

      d.    Whether Defendant designed the da Vinci robot to preclude third-party maintenance or service of the robot;

      e.    Whether Defendant required that customers purchase da Vinci robot service from Defendant in order to access replacement parts;

      f.    Whether Defendant monopolized the aftermarket for da Vinci parts and service;

g.  Whether Defendant used the sale of the da Vinci robot to ensure its customers abide by the EndoWrist use limits and purchase replacement EndoWrists from Intuitive once those limits are reached;

h.  Whether Defendant used the sale of da Vinci robot parts and service to ensure its customers abide by the EndoWrist use limits and purchase replacement EndoWrists from Intuitive once those limits are reached;

i.  Whether Defendant required purchasers of da Vinci surgical robots to purchase replacements and repairs of EndoWrists exclusively from Defendant;

j.  Whether Defendant required purchasers of da Vinci robot service and parts to purchase replacements and repairs of EndoWrists exclusively from Defendant;

k.  Whether Defendant monopolized the EndoWrist repair and replacement aftermarket;

l.  Whether Defendant's conduct violated the antitrust laws;

m.  Whether Defendant's conduct, as alleged, caused injury to the business and property of Plaintiffs and other members of the Classes;

n.  The effect of Defendant's alleged conduct on the aftermarket for da Vinci robot parts and service in the United States during the Class Period;

o.  The effect of Defendant's alleged conduct on the aftermarket for EndoWrist replacements and repairs in the United States during the Class Period;

p.  The appropriate measure of damages sustained by Plaintiffs and other members of the Classes;

q.  Whether Plaintiffs and other Class members are entitled to injunctive relief; and

r.  The appropriate injunction needed to restore competition in the aftermarket.

178. ***Predominance.*** Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual Class members because Defendant has

acted on grounds generally applicable to the entire Classes, thereby making a common methodology for determining Class damages as a whole appropriate. Such generally applicable conduct is inherent in Defendant's wrongful conduct.

179.     *Superiority.* Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action. Both Classes have a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

180.     *Ascertainability*. The members of the Classes are ascertainable by applying objective criteria to business records maintained by Defendant and Class members.

181.     Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION
### COUNT I: TYING
### (DA VINCI ROBOT PARTS AND SERVICE CLASS)

182.     Plaintiffs incorporate and reallege, Paragraphs 1 through 181 of this Complaint as though fully set forth herein.

183.     Intuitive has dominant economic power in the worldwide and domestic markets for minimally invasive surgical robots. Intuitive has used this economic power to coerce its customers into entering into multi-year, exclusive servicing agreements with Intuitive and to preclude its customers from using third-party services to perform maintenance on da Vinci surgical robots. Intuitive has conditioned the sale its da Vinci surgical robots on customers' purchasing da Vinci parts and service from Intuitive alone, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Intuitive has further prevented the use of third-party repair services for the da Vinci

surgical robot through its anticompetitive design scheme, including by requiring that certain parts have Intuitive-generated serial numbers and encrypting and rendering inaccessible to robot owners and third-party service providers the software necessary for certain kinds of maintenance, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. These contractual and technological tying arrangements, along with Intuitive's aggressive enforcement of them, have anticompetitive effects in the aftermarket for da Vinci parts and service, including foreclosing a substantial volume of commerce in those markets, and have occurred in and affected a substantial amount of interstate commerce.

184.    As a direct and proximate result of the foregoing conduct, Intuitive has forced customers to purchase da Vinci parts and service at supracompetitive prices. These injuries are antitrust injuries, because they flow from that which makes Intuitive's conduct unlawful under the Sherman Act.

## COUNT II: EXCLUSIVE DEALING
### (DA VINCI ROBOT PARTS AND SERVICE CLASS)

185.    Plaintiffs incorporate and reallege, Paragraphs 1 through 181 of this Complaint as though fully set forth herein.

186.    Intuitive has dominant economic power in the domestic market for minimally invasive surgical robots, the domestic aftermarket for da Vinci robot parts and service, and the domestic aftermarket for replacements and repairs of EndoWrists. Intuitive has taken measures and entered into agreements with its customers that require the customers to service the da Vinci robot and purchase replacement parts from Intuitive exclusively. These agreements are unreasonable restraints of trade that have foreclosed competition in the domestic aftermarket for da Vinci parts and service, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

187.    As a direct and proximate result of the foregoing conduct, Intuitive has forced customers to purchase da Vinci parts and service at supracompetitive prices. These injuries are antitrust injuries, because they flow from that which makes Intuitive's conduct unlawful under the Sherman Act.

## COUNT III: MONOPOLIZATION
### (DA VINCI ROBOT PARTS AND SERVICE CLASS)

49

188.     Plaintiffs incorporate and reallege, Paragraphs 1 through 181 of this Complaint as though fully set forth herein.

189.     Intuitive has willfully obtained and willfully maintains monopoly power in the domestic aftermarket for da Vinci robot parts and service in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Intuitive maintains at least a 99% market share by excluding competitors. Intuitive's exclusionary tactics include tying the sale of the da Vinci surgical robot to the purchase of replacement parts and service from Intuitive; including contractual provisions in sales and servicing agreements prohibiting customers from having their da Vinci robots serviced by third parties; designing da Vinci robots to inhibit the ability of third-party servicers to perform maintenance on them; sending cease-and-desist letters when customers attempt to use third-party servicers for da Vinci robots; and threatening and coercing customers who attempt to repair their da Vinci robots with third-party servicers.

190.     As a direct and proximate result of the foregoing conduct, Intuitive has forced customers to purchase da Vinci parts and service at supracompetitive prices. These injuries are antitrust injuries, because they flow from that which makes Intuitive's conduct unlawful under the Sherman Act.

### COUNT IV: TYING
### (ENDOWRIST CLASS)

191.     Plaintiffs incorporate and reallege, Paragraphs 1through 181 of this Complaint as though fully set forth herein.

192.     Intuitive has dominant economic power in the worldwide and domestic markets for minimally invasive surgical robots and in the aftermarket for da Vinci robot parts and service. Intuitive has used this economic power to coerce its customers into buying unnecessary and overpriced replacement EndoWrists from Intuitive and to restrict their ability to repair EndoWrists. Intuitive has conditioned the sale and servicing of its da Vinci surgical robots on customers' buying replacement EndoWrists from Intuitive instead of repairing the EndoWrists that the customers already have, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Intuitive has further prevented the use of third-party repair service for EndoWrists through its anticompetitive

CLASS ACTION COMPLAINT

design scheme, which includes a memory-wiper that is triggered when an EndoWrist reaches an arbitrary number of uses set by Intuitive and the introduction of a newer EndoWrist chip that provides no new functionality but is designed solely to preclude third parties from using repair solutions developed in response to the memory-wiper, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. These contractual and technological tying arrangements, along with Intuitive's aggressive enforcement of those arrangements, have anticompetitive effects in the aftermarket for replacements and repairs of EndoWrists, including foreclosing a substantial volume of commerce in those markets, and have occurred in and affected a substantial amount of interstate commerce.

193.    As a direct and proximate result of the foregoing conduct, Intuitive has forced customers to purchase unnecessary EndoWrists at supracompetitive prices. These injuries are antitrust injuries, because they flow from that which makes Intuitive's conduct unlawful under the Sherman Act.

### COUNT V: EXCLUSIVE DEALING
### (ENDOWRIST CLASS)

194.    Plaintiffs incorporate and reallege, Paragraphs 1 through 181 of this Complaint as though fully set forth herein.

195.    Intuitive has dominant economic power in the domestic market for minimally invasive surgical robots, the domestic aftermarket for da Vinci robot parts and service, and the domestic aftermarket for replacements and repairs of EndoWrists. Intuitive has taken measures and entered into agreements with its customers that require the customers to service and replace their EndoWrist instruments with Intuitive exclusively. These agreements are unreasonable restraints of trade that have foreclosed competition in the domestic aftermarket for replacements and repairs of EndoWrist instruments, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

196.    As a direct and proximate result of the foregoing conduct, Intuitive has forced customers to purchase EndoWrists unnecessarily at supracompetitive prices. These injuries are antitrust injuries, because they flow from that which makes Intuitive's conduct unlawful under the Sherman Act.

### COUNT VI: MONOPOLIZATION

**(ENDOWRISTS CLASS)**

197.     Plaintiffs incorporate and reallege, Paragraphs 1 through 181 of this Complaint as though fully set forth herein.

198.     Intuitive has willfully obtained and willfully maintains monopoly power in the domestic aftermarket for replacements and repairs of EndoWrists in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Intuitive maintains at least a 99% market share by excluding competitors. Intuitive's exclusionary tactics include tying the sale of da Vinci robots to the commitment to abide by EndoWrist use limits and to purchase replacement EndoWrists from Intuitive once those limits are reached, tying the ongoing maintenance of da Vinci robots to the commitment to abide by EndoWrist use limits and to purchase replacement EndoWrists from Intuitive once those limits are reached, prohibiting customers from having their EndoWrists repaired, sending cease-and-desist letters when customers attempt to repair EndoWrists, threatening and coercing customers who attempt to repair EndoWrists, incorporating a memory-wiper into every EndoWrist instrument to require additional EndoWrist purchases instead of repairs, and introducing design changes intended to thwart repair solutions developed by third parties in response to the memory-wiper.

199.     As a direct and proximate result of the foregoing conduct, Intuitive has forced customers to purchase EndoWrists unnecessarily at supracompetitive prices. These injuries are antitrust injuries, because they flow from that which makes Intuitive's conduct unlawful under the Sherman Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and both Classes, pray that:

(a)     The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Classes defined herein, appoint Plaintiffs as representatives of both Classes, appoint Plaintiffs' counsel of record as counsel for both Classes, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes once certified;

(b)     Defendant's actions alleged herein be adjudged and decreed to be in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2;

(c) Plaintiffs and the other members of the Classes recover their damages from Defendant, in an amount to be determined, and that this damages amount be trebled pursuant to 15 U.S.C. § 15(a);

(d) Plaintiffs and the other members of the Classes be awarded pre- and post-judgment interest as allowed by law and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

(e) Defendant, its affiliates, successors, heirs, transferees, assignees, and officers, directors, partners, agents, and employees thereof, and all other entities or persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct and overcharges alleged herein, or from engaging in any other conduct, conspiracy, combination, or overcharges having a similar purpose or effect;

(f) Plaintiffs and the other members of the Classes recover the costs of this lawsuit and reasonable attorneys' fees, as provided by law; and

(g) Plaintiffs and the other members of the Classes be granted such other relief as the case may require and deemed proper to this Court.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this case.

Dated: July 6, 2021          By:  */s/ Judith A. Zahid*
Judith A. Zahid (SBN 215418)
Heather T. Rankie (SBN 268002)
James S. Dugan (SBN 325565)
**ZELLE LLP**
555 12th Street, Suite 1230
Oakland, CA 94607
Tel: (415) 693-0700
Fax: (415) 693-0770
jzahid@zelle.com
hrankie@zelle.com
jdugan@zelle.com

Jennifer Duncan Hackett (*pro hac vice* forthcoming)
**ZELLE LLP**
1775 Pennsylvania Avenue, NW, Suite 375
Washington, D.C. 20006
Tel: (202) 899-4100
Fax: (612) 336-9100
jhackett@zelle.com

Benjamin D. Brown (SBN 202545)
Daniel McCuaig (*pro hac vice* forthcoming)

**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave., Suite 500
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
bbrown@cohenmilstein.com
dmccuaig@cohenmilstein.com

Manuel J. Dominguez (*pro hac vice* forthcoming)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
Tel: (561) 515-2604
Fax: (561) 515-1401
jdominguez@cohenmilstein.com

Christopher J. Bateman (*pro hac vice* forthcoming)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Tel: (212) 838-7797
Fax: (212) 838-7745
cbateman@cohenmilstein.com

*Attorneys for Plaintiffs*